(No. 58728.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY GUEST, Appellant.

*Opinion filed December 19, 1986.—Rehearing denied January 30, 1987.*

78

CLARK, C.J., and GOLDENHERSH and SIMON, JJ., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield (Lawrence J. Essig, Assistant Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Kevin Sweeney and Maureen Harton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Anthony Guest, was charged by information filed in the circuit court of Cook County with five counts of murder (Ill. Rev. Stat. 1979, ch. 38, pars. 9—

80

1(a)(1) through (a)(3)), one count of attempted murder (Ill. Rev. Stat. 1979, ch. 38, par. 8—4), three counts of aggravated kidnaping (Ill. Rev. Stat. 1979, ch. 38, pars. 10—2(a)(3), (a)(5)), two counts of aggravated battery (Ill. Rev. Stat. 1979, ch. 38, pars. 12—4(a), (b)(1)), eight counts of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2), and two counts of unlawful use of weapons (Ill. Rev. Stat. 1979, ch. 38, pars. 24—1(a)(4), (a)(10)). The defendant waived a jury trial, and his case was tried to the court. At the conclusion of trial, defendant was found guilty of the following charges: (1) one count of intentional murder; (2) one count of knowing murder; (3) one count of felony murder; (4) one count of attempted murder; (5) one count of aggravated battery; and (6) two counts of unlawful use of weapons. The court merged the convictions for attempted murder and aggravated battery.

The defendant received a sentence of 30 years for attempted murder, with a mandatory supervised release period of three years. This sentence was to run consecutively to two sentences in the State of Tennessee for armed robbery and bank robbery and consecutively to two sentences of 35 years and life imprisonment imposed in the State of Missouri for two armed robberies. The defendant was sentenced to 360 days on each count of unlawful use of weapons, with those sentences to run concurrently with the sentence for attempted murder but consecutively to his sentences in Tennessee and Missouri. In addition, the defendant was sentenced to death for murder under the multiple-murder aggravating-factor provision of the death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)). Because the death penalty has been imposed, defendant's appeal comes directly to this court pursuant to Rule 603 (87 Ill. 2d R. 603).

The facts are not in dispute. On February 5, 1981,

defendant entered a Chicago grocery store. Ferris King, a security guard, observed him place toothpaste and a toothbrush in his pocket. King approached the defendant, identified himself, and asked the defendant to accompany him to his office located in the basement of the building. Defendant complied. However, when the two men arrived at the office, defendant confronted King with a handgun.

Thereafter King, followed by defendant, left the office and proceeded to an employee's cafeteria also located in the basement. Three employees—Joanne Bailey, Marlean Washington, and Gary Henderson—were in the cafeteria when the two men entered. As two of the employees attempted to flee, defendant began firing in their direction. King responded by reaching for his gun, at which point defendant fired at him, hitting him in the shoulder. Defendant then fled, running south down a corridor, up the stairs, and out the front of the store. King then abandoned his pursuit of the defendant and, moments later, found John Geever, another employee, wounded and lying at the south end of the first floor. Geever subsequently died of a gunshot wound.

We briefly summarize certain of the testimony at trial and various stipulations which are relevant to resolution of issues defendant raises concerning the conduct of his trial.

Bailey testified that, shortly before King and defendant entered, she saw Geever come in, purchase a can of soda and leave through a door on the south side of the room. She also testified on direct examination that the defendant fired a shot towards her. On cross-examination, Bailey admitted that on the date of the incident she did not tell police that defendant had fired a shot towards her or that she had seen Geever in the cafeteria prior to the shooting. At this point in Bailey's cross-examination, defense counsel moved to strike her testi-

mony for alleged noncompliance with discovery, specifically asserting the State's failure to disclose her statements regarding Geever's presence in the cafeteria shortly before the shooting. The trial court denied defendant's motion.

Defense counsel then moved for a mistrial, alleging his own ineffective assistance of counsel for failure to interview Bailey prior to trial. Counsel contended that he was ineffective because, considering the asserted circumstantial nature of the State's case, had he discovered this evidence he would not have advised the defendant to waive his right to a jury trial. The trial court also denied this motion.

The parties stipulated that if Washington were to testify she would state that she was in the cafeteria in the company of Bailey and Henderson and that, when the defendant fired the first shot, she tipped one of the tables on its side and hid behind it. She would testify further that, after the defendant and King left the cafeteria, she heard a commotion at the south end of the hallway; that she walked toward the south end of the hallway; and that she found Geever lying on the hallway floor at the foot of the south staircase. She would further testify that Geever told her he was hurt, and that he then got up, climbed to the top of the stairs, and collapsed.

There were other stipulations concerning various police officers who had worked on the investigation. Two detectives would have testified that Henderson picked out a photograph of the defendant and stated that it bore a resemblance to the perpetrator. The detectives would have testified further that they showed various photographs to King, Bailey, and Washington and that each of them picked out a picture of the defendant, stating that it looked like the perpetrator but noting that the perpetrator had shorter hair and was clean shaven.

There was a further stipulation that defendant was identified by King and Washington at a later lineup.

The parties stipulated regarding the testimony of two evidence technicians who investigated the scene and discovered bullet fragments in various locations in the basement of the store. They would have testified that the fragments were placed in an envelope and marked for identification but that none of the fragments proved suitable for identification or comparison. In addition, one of the technicians would have testified that he delivered to the crime lab a sealed medical examiner's envelope containing the bullet recovered from the body of the victim. It was stipulated that the crime lab also received the revolver which was used by King on the date in question. By further stipulation, the firearms examiner would have testified that he "test fired" King's gun, compared those bullets with the bullet recovered from the victim's body, and was of the opinion that the bullet recovered from the body was not fired from King's gun.

King testified at trial that he was taken to the hospital by police for treatment of his wound. At the hospital, he removed his shirt, at which time an "intact" bullet fell out. He testified that a uniformed officer retrieved the bullet. However, there was conflicting testimony at trial by uniformed police officers who were at the hospital when King was treated. They testified that they had no knowledge of a bullet being recovered.

We noted above that defendant was found guilty of murder, attempted murder, aggravated battery, and unlawful use of weapons. As to the convictions for murder, defense counsel moved, prior to the death sentencing hearing, for a "specific finding of facts as to the murder counts." He argued that he would have "substantially different arguments to adduce, different mitigation to adduce," during the hearing depending upon whether defendant was found to have killed Geever under the in-

tentional-murder provision of the statute or under the felony-murder provision. The court denied the motion. On several occasions, defense counsel unsuccessfully renewed this motion.

During the first phase of the sentencing hearing, there was testimony that the defendant had been tried by a jury and convicted of second-degree murder in Los Angeles County, California. There, defendant was sentenced as follows: 15 years to life plus a consecutive determinate-enhancement term of 3 years for murder; 2 years for personal use of a handgun; and 1 year for a prior conviction. These sentences were to be served consecutively to the sentences he was serving in Missouri.

The defendant raises 19 issues. The first five issues pertain to the trial of this cause; eight issues concern the sentencing hearing; five issues involve the constitutionality of the death penalty statute; and one issue deals with two motions which we took with this case regarding the Agreement on Detainers.

We turn initially to consideration of the issues raised regarding the trial of this cause. Defendant first maintains that he was not proved guilty beyond a reasonable doubt. He argues that the State's evidence established that the gunshots attributed to him through King's testimony were accounted for in such a way that he could not be the cause of the fatal wound. One shot was fired in the direction of the three employees seated in the cafeteria. Another shot was fired at King, wounding him in the shoulder. The third shot was fired, also in the direction of King, while defendant was fleeing down the basement hallway. Defendant contends that no further shots were attributed to him; therefore, he could not have shot and killed Geever.

The defendant's argument defies logic where the trial court found beyond a reasonable doubt that: (1) only King and the defendant were firing guns at the time of

the incident; (2) the ballistics evidence proved that the fatal bullet did not come from King's gun; (3) the victim had been seen alive in the cafeteria shortly before any shooting began; (4) the victim was found wounded in the same hallway which defendant used to make his escape; and (5) there was no evidence to support the defendant's theory that someone else was present and shot the victim, thereby making that theory unreasonable.

Defendant relies on *People v. Garrett* (1975), 62 Ill. 2d 151, where this court held that when a "conviction of murder rests solely upon circumstantial evidence, the guilt of the defendant must be so thoroughly established as to exclude every other *reasonable* hypothesis." (Emphasis added.) (62 Ill. 2d 151, 163.) On the facts of this case, the State has carried this burden. Given the evidence at trial, defendant's theory that someone else shot the victim is unreasonable.

Defendant's second issue concerns the admissibility of testimony given by Bailey. Defendant relies on *People v. Pellegrino* (1964), 30 Ill. 2d 331, arguing that it is analogous to his case and, therefore, controlling. In *Pellegrino*, this court reversed defendant's conviction for murder. However, *Pellegrino* is clearly distinguishable. In *Pellegrino*, there were two witnesses who testified that they had seen the defendant hit and kick the deceased. One witness had been "punched" by the deceased just prior to the beating which killed him. This witness was said to have been stunned, bleeding, and crying at the time the deceased was attacked. She first accused one man, then another, and finally said it was the defendant. The other witness stated that she had been drunk for four weeks, that she was suffering from the "shakes," and that she could not recognize the person located three feet away from her who was assisting the first witness.

*Pellegrino* is not controlling. Here, when speaking to

the police, Bailey omitted the fact that she had seen the victim in the cafeteria prior to the shooting and the fact that the defendant's first shot was fired towards her. These omissions are neither analogous to changing testimony regarding the identity of the person who committed the crime nor analogous to a witness being so ill that she could not identify a person three feet in front of her. Also, it should be noted that Bailey's testimony regarding the defendant's first shot towards her was corroborated by the testimony of King and Washington. These omissions do not justify striking this testimony at trial. The trial court properly allowed it to stand.

Defendant raises an additional challenge to the admission of Bailey's testimony that she saw the victim in the cafeteria. The defendant maintains that this testimony should have been stricken because the prosecution violated discovery by failing to disclose it. The State contends that the trial court properly denied defendant's motion to strike. The State argues that denial was proper because (1) the defendant's motion was untimely; (2) the State had complied with the defendant's request for discovery by tendering Bailey's statement given to the police; (3) the State had no obligation under our Rule 412 (87 Ill. 2d R. 412) to reduce Bailey's testimony to writing before she took the witness stand; (4) defense counsel knew for more than a year that Bailey was a potential prosecution witness and could have interviewed her; and (5) the defendant could have requested a continuance following Bailey's testimony but failed to do so.

We agree that the motion to strike this portion of Bailey's testimony was properly denied. The defendant cites *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, as authority for the proposition that the State was required to produce this evidence. In *Brady*, the Supreme Court held that ''suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97.

The holding in *Brady* was clarified in *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562. In *Moore*, the Supreme Court set out a three-part test for determining if evidence has been suppressed and, if so, whether or not the suppression constitutes a violation of due process. The test requires that: (1) there was, in fact, a suppression of evidence by the prosecution after disclosure was requested by the defense; (2) the evidence suppressed was favorable to the defense; and (3) the evidence was material. (408 U.S. 786, 794-95, 33 L. Ed. 2d 706, 713, 92 S. Ct. 2562, 2568.) Under *Brady* and *Moore*, defendant must first show that he requested evidence to which he was entitled and that the State did not disclose it. Failure to make this showing ends the analysis, and there is no need to consider the favorability or materiality of the undisclosed evidence.

It is clear, on this record, that the defendant has not established that the State suppressed evidence properly subject to disclosure under *Brady* and *Moore*. Here, the State provided the defense a copy of the statement Bailey gave to the police. For more than a year, her name was listed by the State as a potential witness. Further, we do not believe that the State is required to reduce to writing the testimony which a witness is expected to give on the stand.

Defendant, however, argues that Bailey's statement regarding Geever's presence in the cafeteria was made to the prosecutor the morning of trial. This fact does not alter our analysis. The State cannot possibly predict everything to which a witness will testify. It is for this reason that our judicial system provides each side with an opportunity to examine and, possibly, impeach any

witness. Further, the State cannot always perceive the weight defense counsel will place on a given piece of evidence. Since the theory of defense counsel that someone else could have been present and shot the victim was unreasonable, it is not likely that the State would have known that the defense viewed Bailey's statement as significant. Consequently, the trial court did not err in denying defendant's motion to strike portions of Bailey's trial testimony.

The third issue raised by defendant relates to his trial counsel's alleged ineffectiveness for failure to interview Bailey. The defendant maintains that if defense counsel had known that Bailey was going to testify as to the victim's presence in the cafeteria, he would not have advised the defendant to waive a jury trial. We find defendant's argument without merit.

Defendant contends that defense counsel proceeded on a "rather sophisticated theory that there was a reasonable hypothesis of the defendant's innocence, and that had he [defense counsel] discovered this critical evidence he would not have advised his client to present this defense in a bench trial." We do not believe that Bailey's testimony was "critical evidence" without which the defendant could not make a knowing jury waiver. Furthermore, on this record, we do not believe that counsel was ineffective in representing the defendant.

Allegations of ineffective assistance of counsel are evaluated under the test enunciated by the Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which this court adopted in *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. Under *Strickland*, a defendant claiming ineffective assistance of counsel must show: (1) that advice of counsel fell outside the " 'range of competence demanded of attorneys in criminal cases' " and (2)

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2065, 2068.

Defendant has not satisfied the *Strickland* test. During the trial, defense counsel cross-examined Bailey and demonstrated that she had failed to tell the police of the victim's presence in the cafeteria seconds before the shooting began and that the defendant had fired a shot towards her. In so doing, defense counsel attempted to impeach Bailey's credibility, which is what he would have done even if he had interviewed her prior to trial. Further, as stated earlier, there was corroboration of her testimony by that of King and Washington as well as by the deceased's proximity to the area of the shooting. Therefore, the importance of this evidence is not what the defendant maintains. Under the circumstances of this case, we do not believe that defense counsel's failure to interview Bailey prior to trial, even if error, fell outside the range of competence required of a criminal attorney or that, but for defense counsel's failure to interview Bailey, the result of the trial would have been different.

The defendant next contends that he was denied due process of law because his waiver of a jury trial was neither voluntary nor knowing where he was unaware that Bailey intended to testify that she had seen the victim in the cafeteria prior to the shooting. This issue does not require lengthy discussion since a determination of whether a defendant has made a voluntary and knowing waiver of a jury trial cannot be based on his lack of knowledge regarding an alleged inconsistency between a witness' statement and later testimony, particularly where, as here, there is no allegation that defendant was denied a fair trial because he received a bench trial rather than a jury trial. In this regard, we note that the

defendant signed a jury waiver in open court; that he was asked by the trial court whether he understood that he was giving up his "right to have twelve men and women determine [his] guilt or innocence"; and that the defendant indicated he understood and still wished to waive his right to a jury trial. Under these circumstances, we believe that the defendant's argument alleging a violation of his right to due process is without merit.

Defendant's fifth issue concerns the alleged loss of ballistics evidence. As earlier stated, King testified at trial that the defendant shot him. According to King, the bullet grazed his right shoulder and became lodged in his shirt. He further testified that while he was at the hospital, he "pulled off [his] shirt and the bullet fell out." He then testified that a uniformed police officer picked the bullet up, showed it to him, and gave the bullet to the attending physician, who "washed it off and put some kind of stuff on it, and put plastic over it." Apparently, that was the last time King saw the bullet.

Defense counsel responded to King's testimony with an oral motion to dismiss or, in the alternative, a motion for a mistrial based on the prosecution's failure· to produce this bullet. Defendant's motions were continued until the close of the State's case in chief. During its case in chief, the State called two police officers who were at the hospital. Each officer testified that he had no knowledge of a bullet being recovered from King. There were also stipulations that none of the other police officers who participated in the investigation of the case ever received or had any knowledge of the bullet that was alleged to have fallen from King's shirt. Defendant's motions were subsequently denied.

Defendant again argues that, under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, the State was required to produce the bullet. As

discussed above, under *Brady*, as clarified by *Moore*, the defendant must establish, as a threshold requirement, that the evidence was requested and that the State failed to disclose it. (*Moore v. Illinois* (1972), 408 U.S. 786, 794-95, 33 L. Ed. 2d 706, 713, 92 S. Ct. 2562, 2568.) However, implicit in meeting this threshold requirement is establishing the fact that the State does possess certain evidence. Here, the defendant has not established that the State ever had possession of the bullet. Other than King's statement that the bullet fell from his shirt, there is absolutely no evidence to support the fact that the bullet existed, much less that it was in the State's possession. In the absence of proof that the State was in possession of this bullet, there can be no violation of *Brady* and *Moore*. Accordingly, the trial court did not err in denying the defendant's motions to dismiss or to declare a mistrial based on the alleged loss of this ballistics evidence.

We have determined that none of the issues the defendant raises regarding his trial have merit. We therefore affirm his convictions.

The defendant next raises eight issues concerning imposition of the death penalty. Defendant's major contention is that the trial court erred in concluding that the murder statutes of Illinois and California are substantially similar for purposes of finding him eligible for the death penalty under section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)).

Section 9—1(b)(3) provides:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

\* \* \*

3. The defendant has been convicted of murdering

two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is *substantially similar* to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)) (hereinafter, the multiple-murder, aggravating-factor provision).)

Imposition of the death penalty under this provision requires a comparative analysis of the murder statutes of Illinois and California. Under this analysis, we must determine whether or not conduct which constitutes murder in California would constitute murder in Illinois if it had occurred here.

Illinois' murder statute is set forth in section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)) and provides:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter." Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a).

California's murder statute is set out in sections 187 through 189 of the Penal Code. (Cal. Penal Code secs. 187 through 189 (Deering 1981).) We are concerned only with sections 187 through 189 in force on March 24, 1981, the date of the killing which eventuated in defend-

ant's conviction for second-degree murder in California. Sections 188 and 189 have been amended since March 24, 1981. We have reviewed the amendments and find that they do not affect the issue of the substantial similarity between the murder statutes of the two States.

Section 187 of the California Penal Code provides in pertinent part:

"(a) Murder is the unlawful killing of a human being *** with malice aforethought."

Section 188 provides:

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

Section 189 provides in pertinent part:

"All murder which is perpetrated by means of a destructive device or explosive, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 [lewd or lascivious acts involving children], is murder of the first degree; and all other kinds of murders are of the second degree." Cal. Penal Code secs. 187 through 189 (Deering 1981).

Defendant contends that the statutory provisions of Illinois and California are not substantially similar, citing four major differences. The first difference concerns the mental states which must be established to prove murder. Illinois law requires proof of intent or knowledge while California law requires proof of malice aforethought, express or implied, concepts which defendant argues are no longer recognized in Illinois. Second, defendant maintains that California, unlike Illinois, treats as murder killings based solely upon a mental

state of recklessness. Defendant points out that, in Illinois, proof of recklessness can never give rise to a finding of murder but can support only a finding of the lesser offense of involuntary manslaughter. Third, defendant contends that California defines as murder killings which result from an unreasonable, but honest, belief in the necessity of self-defense while, in Illinois, such killings are not murder but, rather, voluntary manslaughter. Fourth, California, unlike Illinois, divides the general category of murder into first- and second-degree murder. Defendant maintains that this is a significant difference because, in California, the death penalty is a possible punishment only for first-degree murder while, in Illinois, the death penalty is a possible punishment upon any conviction under the murder statute if one of the statutory aggravating factors is proved beyond a reasonable doubt.

The State frames the issue differently. Relying on *People v. Davis* (1983), 95 Ill. 2d 1, 35-36, which held that application of the multiple-murder, aggravating-factor provision requires that each murder conviction must be based upon either intent or knowledge, the State contends that the real issue is whether or not second-degree murder in California requires an intentional or knowing mental state. The State maintains that the mental state required for second-degree murder is knowledge and not recklessness as claimed by the defendant. Thus, the State concludes that second-degree murder in California is substantially similar to section 9—1(a)(2) of the Illinois murder statute, which provides that a killing, without lawful justification, is murder where it is the result of conduct which the actor knows will "create a strong probability of death or great bodily harm." Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2).

It is the State's position that this similarity is sufficient to justify application of the multiple-murder, aggra-

vating-factor provision and sustain the death penalty imposed by the trial court. While the State oversimplifies the analysis, we agree that the murder statutes of Illinois and California are substantially similar for purposes of the multiple-murder, aggravating-factor provision.

The substantial similarity between the murder statutes is not found in the language of the respective statutes but, rather, in the mental states required by each statute in order to prove the offense of murder. California, in defining murder, retains the common law language of express and implied malice aforethought. Under California law, express malice is the deliberate intent to kill; that is, express malice exists where it is shown that the actor entertained the specific purpose of taking a life. *People v. Mattison* (1971), 4 Cal. 3d 177, 183, 481 P.2d 193, 197, 93 Cal. Rptr. 185, 189; *People v. Conley* (1966), 64 Cal. 2d 310, 321-22, 411 P.2d 911, 918, 49 Cal. Rptr. 815, 822; *cf. People v. Cruz* (1980), 26 Cal. 3d 233, 242, 605 P.2d 830, 834, 162 Cal. Rptr. 1, 4.

Malice is implied where an actor, for a base and antisocial motive, proceeds, in conscious disregard of life, deliberately committing an act which he knows entails a high probability of endangering life. *People v. Watson* (1981), 30 Cal. 3d 290, 300, 637 P.2d 279, 285, 179 Cal. Rptr. 43, 49; *People v. Poddar* (1974), 10 Cal. 3d 750, 757-60, 518 P.2d 342, 347-49, 111 Cal. Rptr. 910, 915-17; *People v. Mattison* (1971), 4 Cal. 3d 177, 183, 481 P.2d 193, 196-97, 93 Cal. Rptr. 185, 188-89.

We note that the meaning given to express malice under the California murder statutes is virtually identical to the meaning given to intent as found in section 9—1(a)(1) of our murder statute. In Illinois, intent is defined as having the conscious objective or purpose to accomplish a result or engage in conduct which a particular statute defines as an offense. (Ill. Rev. Stat. 1979, ch. 38, par. 4—4; see Ill. Ann. Stat., ch. 38, par. 9—1,

Committee Comments, at 17 (Smith-Hurd 1979).) It is clear that the murder statutes in both Illinois and California recognize intent as a mental state sufficient to sustain a conviction for murder and that both States define this mental state in similar language.

It is also clear that the meaning given to implied malice under California law closely tracks the meaning given to knowledge under Illinois law. Thus, in Illinois, an individual acts with knowledge where: (1) he knows with practical certainty that his conduct will cause death (Ill. Rev. Stat. 1979, ch. 38, par. 4—5(b); see Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 17 (Smith-Hurd 1979)); or (2) he knows that his conduct "create[s] a strong probability of death or great bodily harm." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2); see Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 18-19 (Smith-Hurd 1979)). To summarize, under both Illinois and California law, a killing constitutes murder where it is shown that the actor: (1) intentionally sought to bring about the death of another or (2) had knowledge that his conduct was practically certain to cause death or created a high or strong probability that death would result.

The foregoing analysis has focused on the meaning rather than the language of the Illinois and California murder statutes. That this is the proper approach is made clear by the committee comments accompanying the current murder statute in Illinois as well as by prior decisions of this court.

The committee comments elaborate the intent of the legislature in 1961 when the present statute was enacted. The legislature intended to retain the common law meaning of express and implied malice but to replace those terms with the more modern and less ambiguous terms of intent and knowledge respectively. (Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at

17 (Smith-Hurd 1979).) The intent of the legislature on this point was recognized by this court in *People v. Davis* (1966), 35 Ill. 2d 55, 60-61, when Justice Schaefer noted:

> "The statutory definitions of murder \*\*\* represent a conscious effort on the part of the draftsmen of the Criminal Code of 1961 to express the requirements of the common-law crimes in simple language. Particularly, the draftsmen sought to avoid any reference to the common-law concept of 'malice aforethought.' This common-law concept, including both 'express' and 'implied' malice, had been applied by this court in a host of decisions. From these decisions, \*\*\* the drafting committee evolved the definitions which appear in the Code.
>
> \*\*\*
>
> \*\*\* *The murder instruction that was given [under section 9—1(a)(2)] expressed a familiar aspect of implied malice.* To justify a conviction of murder, it has not been necessary that the accused should have deliberately formed an intent to kill; it has been sufficient to show that he voluntarily and wilfully committed an act, the direct and natural tendency of which was to destroy another's life. [Citations.] The intent is implied from the character of the act. [Citation.]" (Emphasis added.)

Defendant, however, argues that California, unlike Illinois, recognizes recklessness as a third mental state sufficient to support a finding of murder. We find this argument without merit.

Defendant predicates his argument on the frequent use of the phrase "conscious or wanton disregard of human life" which appears in the California case law as part of the definition of implied malice. (*People v. Poddar* (1974), 10 Cal. 3d 750, 757-58, 518 P.2d 342, 347-48, 111 Cal. Rptr. 910, 915-16; *People v. Mattison* (1971), 4 Cal. 3d 177, 182-83, 481 P.2d 193, 196-97, 93 Cal. Rptr. 185, 188-89.) He fails to acknowledge that these same cases, as well as many others, cite different factors as the principal elements of implied malice. As mentioned

above, the principal elements of implied malice are: (1) the actor's knowledge that his conduct poses a high probability of endangering life and (2) the actor's deliberate performance of such conduct in the face of this knowledge. The descriptive phrase "conscious or wanton disregard," which defendant equates with the mental state of recklessness, merely reinforces the fact that the actor consciously and deliberately chooses to ignore his subjective awareness that death or great bodily harm are highly probable consequences of his conduct. (*People v. Watson* (1981), 30 Cal. 3d 290, 296-97, 637 P.2d 279, 283, 179 Cal. Rptr. 43, 47.) Thus, in California as in Illinois, the actor's knowledge of the probable consequences of particular conduct is critical in determining whether or not a killing is murder. Neither California nor Illinois recognizes recklessness as a mental state sufficient to establish murder.

We find equally unpersuasive defendant's argument that California, unlike Illinois, treats as intentional murder those killings committed in the unreasonable belief that force is necessary for purposes of self-defense. In point of fact, both jurisdictions treat such killings as voluntary manslaughter. Illinois does so by statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b)); California does so by judicial decision (*People v. Flannel* (1979), 25 Cal. 3d 668, 679-80, 603 P.2d 1, 7, 160 Cal. Rptr. 84, 90).

Our comparative analysis of the relevant statutes and case law in Illinois and California convincingly demonstrates that both jurisdictions require the same mental states—intent or knowledge—in order for a killing to constitute murder. In both jurisdictions, intentional killings can be reduced from murder to voluntary manslaughter under certain factual circumstances. (Compare *People v. Fausz* (1983), 95 Ill. 2d 535, with *People v. Flannel* (1979), 25 Cal. 3d 668, 603 P.2d 1, 160 Cal. Rptr. 84.) Moreover, both jurisdictions treat noninten-

tional, nonknowing killing (other than felony murder) as involuntary manslaughter. (Compare Cal. Penal Code sec. 192(b) (Deering 1981) with Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) We conclude, therefore, that the mental states required to establish murder under Illinois and California law are substantially similar for the purposes of imposing the death penalty under the multiple-murder, aggravating-factor provision.

Defendant also attempts to show that the murder statutes in question are different because California, unlike Illinois, recognizes first- and second-degree murder. In California, the degree of murder concerns the penalty upon conviction; it does not concern the mental state which must be established in order for a killing to constitute murder.

> "Thus if a killing is murder within the meaning of sections 187 and 188, and is by one of the means enumerated in section 189, the use of such means makes the killing first degree murder as a matter of law. It must be emphasized, however, that a *killing* by one of the means enumerated in the statute is not murder of the first degree unless it is first established that it is *murder*. If the killing was not murder, it cannot be first degree murder, and a killing cannot become murder in the absence of malice aforethought. Without a showing of malice, it is immaterial that the killing was perpetrated by one of the means enumerated in the statute." (Emphasis in original.) *People v. Mattison* (1971), 4 Cal. 3d 177, 182, 481 P.2d 193, 196, 93 Cal. Rptr 185, 188.

California law classifies certain types of murder as murder in the first degree (Cal. Penal Code sec. 189 (Deering 1981)), a designation which permits imposition of the death penalty (Cal. Penal Code sec. 190 (Deering 1981)). Murders not falling within any of the enumerated categories are deemed murder in the second degree (Cal. Penal Code sec. 189 (Deering 1981)), a designation which precludes imposition of the death penalty (Cal.

Penal Code sec. 190 (Deering 1981)).

This difference between Illinois and California in the manner of imposing the death penalty subsequent to conviction for murder is not relevant to deciding whether or not our multiple-murder, aggravating-factor provision applies. This provision is applicable, by its express terms, where one or more prior convictions for murder were obtained under statutes substantially similar to section 9—1(a) of the Criminal Code of 1961. Section 9—1(a) relates solely to the mental states necessary to establish murder. It is unrelated to imposition of penalty upon conviction for murder. Thus, while defendant has raised a difference between Illinois and California murder statutes, it is not a difference which is relevant to the issue before us.

We observe that the parties have directed only minimal attention to the felony-murder provisions under Illinois and California law. Because our murder statute contains a felony-murder provision and because application of the multiple-murder, aggravating-factor provision requires a substantial similarity between our statute as a whole and that of a foreign jurisdiction, we examine the respective felony-murder provisions before deciding whether or not the murder statutes of Illinois and California are substantially similar. To facilitate analysis, we set out below the respective felony-murder provisions. In Illinois:

> "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> * * *
>
> (3) He is attempting or committing a forcible felony other than voluntary manslaughter." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3).)

A forcible felony is "treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnaping, ag-

gravated battery and any other felony which involves the use or threat of physical force or violence against any individual." (Ill. Rev. Stat. 1979, ch. 38, par. 2—8.) Felony murder in California is "[a]ll murder *** which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 [lewd or lascivious acts involving children] ***." Cal. Penal Code sec. 189 (Deering 1981).

It is apparent, once again, that the language of the above-cited provisions of the two States is different. Therefore, it becomes necessary to ascertain whether or not the difference in language also represents a difference in meaning.

First, both jurisdictions enumerate arson, burglary, rape (in Illinois, rape has been replaced with the offenses of criminal sexual assault and aggravated criminal sexual assault effective July 1984), and robbery as underlying felonies for the purpose of convicting the perpetrator of murder for any killing occurring in the course of committing or attempting to commit one of these felonies. As to enumerated felonies, we believe that California's felony-murder provision is substantially similar to Illinois' felony-murder provision.

Both jurisdictions go further, recognizing a residual category of nonenumerated felonies, any one of which can serve as the predicate felony for purposes of a felony-murder conviction should death result. In Illinois this residual category is statutory and encompasses "any other felony which involves the use or threat of physical force or violence against any individual." (Ill. Rev. Stat. 1979, ch. 38, par. 2—8.) This court has interpreted this provision broadly to include nonviolent felonies which might require force to perpetrate. *People v. Golson* (1965), 32 Ill. 2d 398, 407-08, *cert. denied* (1966), 384 U.S. 1023, 16 L. Ed. 2d 1026, 86 S. Ct. 1951.

California, by judicial decision, also recognizes a residual category of nonenumerated felonies which can serve as predicate felonies for a felony-murder conviction. California's residual category encompasses all felonies "inherently dangerous to human life," whether or not involving force or the threat of force, but not including those felonies enumerated in section 189 of the Penal Code. *People v. Nichols* (1970), 3 Cal. 2d 150, 163, 474 P.2d 673, 681, 89 Cal. Rptr. 721, 729; *People v. Phillips* (1966), 64 Cal. 2d 574, 582-84, 414 P.2d 353, 360-61, 51 Cal. Rptr. 225, 232-33.

We do not undertake here an exhaustive discussion of the case law in Illinois and California to set forth the extent of similarity between Illinois' forcible-felony residual category and California's inherently-dangerous residual category. We note that the parties have not undertaken an examination in this regard. Suffice it to say, insofar as there may be differences between Illinois and California with respect to the residual categories of felony murder, they are not sufficient to support the conclusion that California's murder statute is substantially different from that of Illinois.

We have examined and compared at length the relevant provisions of the murder statutes of California and Illinois. Based on this analysis, we hold that California's murder statute is substantially similar to Illinois' murder statute for purposes of invoking the multiple-murder, aggravating-factor provision.

We next consider whether or not the remaining requirement of the multiple-murder, aggravating-factor provision is met in this case. Under this second requirement, a person is eligible for the death penalty "so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts." Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).

This court recently interpreted the foregoing lan-

guage in *People v. Davis* (1983), 95 Ill. 2d 1, *cert. denied* (1983), 464 U.S. 1001, 78 L. Ed. 2d 697, 104 S. Ct. 507, a case involving a defendant who, like the present defendant, had been convicted of multiple murders occurring at different times and in unrelated circumstances. *Davis* held that where a "defendant is convicted of two or more murders resulting from *intentional or knowing* acts, the death penalty may properly be imposed." (Emphasis added.) (95 Ill. 2d 1, 36.) Therefore, if defendant in the instant case killed both his California and Illinois victims either intentionally or knowingly, this statutory requirement is satisfied and the death penalty may be imposed.

Defendant was convicted of murder in California prior to his conviction for murder here. As discussed above, such a conviction required proof beyond a reasonable doubt that defendant acted with either express malice (intent, in Illinois) or implied malice (knowledge, in Illinois). For purposes of the multiple-murder, aggravating-factor provision, it is immaterial which mental state was established in the California case so long as the mental state actually proved was either intent or knowledge. From what was earlier stated, we are satisfied that the defendant acted either intentionally or knowingly in the California case.

Defendant was charged in Illinois with intentional murder (count 1), knowing murder (count 2), and felony murder (count 3). The record reveals that the trial court found him guilty on all three counts. The court, having heard the witnesses and having weighed the evidence, found that the State had proved each charge beyond a reasonable doubt. However, despite there being evidence to support each charge, it must be remembered that only one person was murdered. In such circumstances, this court has held that only the conviction for the most serious murder offense charged will be upheld, with convic-

tions on the less serious murder charges vacated. (*People v. Jones* (1985), 105 Ill. 2d 342, 359; *People v. Mack* (1984), 105 Ill. 2d 103, 136-37; *People v. Szabo* (1983), 94 Ill. 2d 327, 350.) Where, as here, charges of intentional, knowing, and felony murder have been proved, intentional murder is deemed the most serious offense. (*People v. Mack* (1984), 105 Ill. 2d 103, 136-37.) It is clear, therefore, that defendant's convictions for knowing murder and felony murder should be vacated. Accordingly, the judgment of the trial court is modified to the extent that the defendant's convictions for knowing murder and felony murder are vacated.

Defendant thus stands convicted of intentional murder in Illinois and either intentional or knowing murder in California. Under the authority of *Davis*, we find defendant eligible for the death penalty under the multiple-murder, aggravating-factor provision.

Defendant next contends that imposition of the death penalty in this case is unconstitutionally arbitrary because the California conviction upon which his eligibility depends involved a killing which occurred after, not before, the killing in Illinois. He further points out that Illinois acted before California to secure his presence for trial by entering a detainer against him pursuant to the Agreement on Detainers (Ill. Rev. Stat. 1973, ch. 38, par. 1003—8—9) to which both States are parties. Defendant maintains that only the vagaries of the dockets in California and Illinois resulted in him being tried and convicted in California prior to being tried and convicted in Illinois. Had the trials proceeded in accordance with the dates of the respective offenses and subsequent detainers, defendant claims that he would have been convicted in Illinois before being convicted in California. Under defendant's scenario, conviction on the charges in Illinois would have been his first conviction and he would not have been eligible for imposition of the death penalty

under the multiple-murder, aggravating-factor provision.

A similar argument was made and rejected by this court in *People v. Albanese* (1984), 104 Ill. 2d 504, 533-34, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. In *Albanese*, the court held that the phrase "has been convicted of" as used in the multiple-murder, aggravating-factor provision was not ambiguous. "The statute speaks in terms of prior convictions, not prior offenses, leaving no room for judicial interpretation." 104 Ill. 2d 504, 534.

*Albanese* stands for the proposition that it is the sequence of convictions, not the sequence of conduct, which determines whether or not the multiple-murder, aggravating-factor provision applies in a given case. The mere fact that the killing upon which a prior murder conviction was based actually occurred after the killing upon which the second murder conviction was based does not mean that the imposition of the death penalty under the multiple-murder, aggravating-factor provision is arbitrary. Imposition of the death penalty was not arbitrary in *Albanese*, nor is it arbitrary here, where the only difference between the cases is the fact that all of Albanese's victims were killed in one State while defendant's victims were killed in two States.

Defendant next argues that he was hampered in presenting factors in mitigation and, therefore, was denied a fair sentencing hearing because the trial court did not specify under which of the three murder charges—intent, knowledge, or felony murder—it was basing the finding of guilt. In particular, defendant maintains that absence of specific intent to kill is often the decisive mitigating factor in a death penalty case. Since he did not know whether or not specific intent was the basis of the court's finding of guilt, he concludes that he did not have a fair opportunity to present evidence to mitigate such intent.

The State contends that defendant was eligible for the death penalty under each charge. Consequently, failure of the trial court to specify under which charge it was making its finding could not have prejudiced defendant's opportunity to present evidence in mitigation.

Our review of the record indicates that defendant's argument is groundless because it is based on a misapprehension of the facts of this case as well as the applicable law. First, the record is clear that the trial court did not enter a general finding of guilt. The court stated unequivocally, on several occasions, that it found defendant guilty under count 1 of the information (intentional murder), count 2 (knowing murder), and count 3 (felony murder). Certainly, defendant was on notice that specific intent was a factor about which he might wish to introduce evidence in mitigation. Second, as previously discussed, a finding of guilt on all three statutory grounds where, as here, there has been only one death operates as a conviction only on the charge of intentional murder. (*People v. Jones* (1985), 105 Ill. 2d 342, 359; *People v. Mack* (1984), 105 Ill. 2d 103, 136-37; *People v. Szabo* (1983), 94 Ill. 2d 327, 350.) For this reason as well, defendant was on notice that he should be prepared to proffer evidence mitigating intent.

We also note that once a defendant is found eligible for the death penalty, there is no limit on the type or number of mitigating factors he can offer. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c).) It is the fact of eligibility for the death penalty, not the specific section of the murder statute under which the conviction was obtained, which is significant for purposes of mitigation. In the instant case, defendant, being deemed eligible for the death penalty, would be expected to introduce the same mitigating factors regardless of the form in which the trial judge announced his convictions. Furthermore, nothing in the record suggests that the defendant was hampered from

presenting evidence on all possible mitigating factors by the manner in which the court announced defendant's murder convictions.

Defendant next claims that the trial court erred in accepting his waiver of the sentencing jury made pursuant to section 9—1(d)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)(3)) because the court did not inform him that imposition of the death penalty requires that the jury be unanimous in all of its findings. We find no error.

Waiver of the sentencing jury is valid if it is made voluntarily and knowingly. (*People v. King* (1986), 109 Ill. 2d 514, 546; *People v. Madej* (1985), 106 Ill. 2d 201, 220-21, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 268.) This court has made it clear that waiver of the sentencing jury can be voluntary and intelligent even where the trial court does not explain the unanimity requirement to the defendant prior to accepting the waiver. Where the record indicates that defendant has discussed waiver of the sentencing jury with counsel prior to tendering the waiver and, further, that the defendant has acknowledged before the court that he understands the consequences of waiver, the waiver is deemed voluntary and intelligent. *People v. Madej* (1985), 106 Ill. 2d 201, 220-21.

The record in the instant case reveals that defense counsel tendered a written waiver of the sentencing jury. At that time, defense counsel stated that he had discussed certain ramifications of the waiver with the defendant. This dialogue included consideration of the unanimity requirement. On the present record, we conclude that defendant's waiver of the sentencing jury was voluntary and intelligent. The trial court did not err in accepting it.

Defendant next contends that the trial court erred in permitting the State to call the victim's widow to testify

during the death-qualification phase of the proceeding. He argues that her testimony was irrelevant and intended only to arouse the passions of the court against him.

The State responds that the victim's widow was called solely to establish that the defendant was 18 or over at the time her husband was killed, a factor which the State is required to establish in order to qualify a defendant for the death penalty. The State also claims that defendant did not object and, hence, has waived consideration of this issue on appeal.

We observe initially that the transcript of testimony given by the victim's widow reveals nothing which is relevant to the first phase of a death penalty hearing. The widow did not testify as to the defendant's age on the day her husband was killed. She could not have testified on this point since she did not know the defendant. In fact, defendant's age was shown by a prior witness, who testified that defendant was born in December 1945, making him 35 years old at the time he committed the two murders, that established his eligibility for the death penalty in Illinois. However, we agree with the State that defendant has waived this issue on review by failing to object. (*People v. Walker* (1985), 109 Ill. 2d 484, 504; *People v. Davis* (1983), 95 Ill. 2d 1, 36; compare *People v. Ramirez* (1983), 98 Ill. 2d 439, 452-54 (admission of widow's testimony before a jury during first phase of a death penalty proceeding but objected to by defendant found improper).) Moreover, the entire death penalty hearing in the instant case took place before the court, not a jury. In a bench trial, the judge is presumed to consider only proper evidence. (*People v. Miller* (1964), 30 Ill. 2d 110, 115.) Defendant has not rebutted this presumption.

Defendant also claims error with regard to characterizations of him made by the prosecution during argu-

ment at the close of the aggravation and mitigation phase of the death penalty hearing. The record reveals that the prosecutor referred to defendant as a "devil" and an "anti-god." Defendant argues that he was prejudiced by use of these terms.

The State contends that the prosecutor's remarks were proper since they reflect the defendant's 20-year criminal history. The State points out that these comments were made at the close of the death penalty proceeding where it is proper for the State to argue such factors in aggravation. Even if these comments are questionable, the State argues that the issue has been waived since the defendant failed to object.

We agree that this issue has been waived. An examination of the record indicates that the defendant did not object to these remarks when they were made. Failure to object constitutes waiver of this issue on appeal. (*People v. Walker* (1985), 109 Ill. 2d 484, 504.) Further, we again observe that the death penalty hearing was conducted before the trial judge, who is presumed to consider only proper argument by the parties. (*People v. Miller* (1964), 30 Ill. 2d 110, 115.) There is nothing in the record to suggest that the judge based imposition of the death penalty on these remarks, even assuming they were improper. Certainly the defendant has not rebutted the presumption of propriety. We find no error on this issue.

Defendant's next group of issues challenges the constitutionality of the death penalty statute. First, he challenges that provision of the statute which vests the State's Attorney with the discretionary authority to seek the death penalty. (Ill. Rev. Stat. 1979, ch. 38, par. 9–1(d).) Defendant claims that this provision violates the separation-of-powers doctrine because it delegates judicial functions to the executive branch. This court has rejected this argument, consistently holding that section

9—1(d) does not violate the separation-of-powers doctrine. (*People v. Perez* (1985), 108 Ill. 2d 70, 96, *cert. denied* (1986), 474 U.S. 1110, 88 L. Ed. 2d 931, 106 S. Ct. 898; *People v. Stewart* (1984), 104 Ill. 2d 463, 498-99, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-39, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603.) We also observe that similar arguments have been unsuccessful when presented to the Supreme Court. *Gregg v. Georgia* (1976), 428 U.S. 153, 198, 225, 49 L. Ed. 2d 859, 889, 903, 96 S. Ct. 2909, 2937, 2949 (plurality opinion) (White, J., concurring).

Defendant presents no argument to persuade us to abandon prior holdings on this issue and we decline to do so. We reaffirm prior decisions of this court that the discretion vested in the State's Attorney to seek the death penalty is not violative of the separation-of-powers doctrine.

Defendant next argues that the death penalty statute arbitrarily imposes the death penalty because it makes no provision that imposition of the death penalty be based on a specific finding by the sentencer of the particular factors considered in aggravation and mitigation. Therefore, in the absence of a procedure whereby a sentence of death is reviewed to ascertain whether or not it is proportional to the penalty given in similar cases, defendant concludes that his sentence is arbitrary and should be set aside.

A death penalty statute is valid if it limits and directs the discretion of the sentencer and provides for meaningful appellate review. (*Gregg v. Georgia* (1976), 428 U.S. 153, 188-95, 49 L. Ed. 2d 859, 883-87, 96 S. Ct. 2909, 2932-35.) Our death penalty statute satisfies these constitutional standards. (*People v. Brownell* (1980), 79 Ill. 2d 508, 532-34, 541-44, *cert. dismissed*

(1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59.) Consequently, defendant's contention that the statute arbitrarily imposes the death penalty is totally without merit. *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.

The foregoing conclusion disposes of defendant's contention that proportional review is mandated as a matter of constitutional law. To the contrary, proportional review is a discretionary component of a death penalty statute where a State determines that such review would provide an additional safeguard against arbitrary sentencing. *Pulley v. Harris* (1984), 465 U.S. 37, 48-51, 79 L. Ed. 2d 29, 39-41, 104 S. Ct. 871, 878-80; *People v. Stewart* (1984), 104 Ill. 2d 463, 499.

Defendant also maintains that the death penalty statute is unconstitutional because it does not contain a procedure for insuring that only relevant factors are considered in aggravation and mitigation.

A determination of which factors are to be considered in imposing the death penalty is a matter left largely to the States. (*California v. Ramos* (1983), 463 U.S. 992, 999-1001, 77 L. Ed. 2d 1171, 1179-81, 103 S. Ct. 3446, 3452-53.) Our statute sets out the factors which are deemed relevant to imposition of the death penalty. (Ill. Rev. Stat. 1979, pars. 9—1(b), (c), (e).) This court has held that the guidelines established by the death penalty statute minimize arbitrary action by the sentencer. (*People v. Jones* (1982), 94 Ill. 2d 275, 284-86, *cert. denied* (1983), 464 U.S. 920, 78 L. Ed. 2d 264, 104 S. Ct. 287.) In our view, the statutory guidelines also 'serve to avoid the use of irrelevant factors. Furthermore, as regards his sentence, the defendant has not provided any evidence to indicate that the sentencing judge utilized factors irrelevant either on constitutional or statutory grounds. Without such a showing, we can-

not conclude that defendant's sentence was based on irrelevant factors.

Defendant further contends that the death penalty statute is unconstitutional because the sentencer, here the trial judge, is not required to find death to be the appropriate punishment after weighing aggravating and mitigating factors and because defendant has the burden of proving that death is an inappropriate punishment. Once again, we observe that these issues have been raised and rejected in prior cases. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46, *cert. denied* (1985), 474 U.S. 883, 88 L. Ed. 2d 173, 106 S. Ct. 204; *People v. Jones* (1982), 94 Ill. 2d 275, 283-84.) The death penalty statute meets the fundamental constitutional requirement that the sentencer weigh all relevant factors in aggravation and mitigation and determine that none of the mitigating factors precludes imposition of the death penalty. (*People v. Brownell* (1980), 79 Ill. 2d 508, 533-34.) We decline to impose a further requirement that the sentencer specifically find death to be the appropriate penalty. Since there is no such requirement, defendant does not bear any burden of proving that the death penalty is inappropriate. *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446.

Defendant next argues that the death penalty statute is unconstitutional because it does not require the State to prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude imposition of the death penalty. This precise contention has been raised before this court on a number of occasions. It has been rejected repeatedly as being without merit. (*People v. Perez* (1985), 108 Ill. 2d 70, 96; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 444; *People v. Kubat* (1983), 94 Ill. 2d 437, 504.) Defendant has not advanced any argument in support of his position but, rather, asks us to reconsider prior decisions on this issue. We decline

defendant's invitation and reaffirm those decisions.

We took two motions under advisement with this case. Both motions were filed by the defendant to supplement the record on appeal. The State filed written objections to both motions.

In his first motion, the defendant requests that the record be supplemented with a copy of the defendant's "Agreement on Detainers" with the State of Illinois dated April 17, 1981, and a copy of the defendant's "Agreement on Detainers" with the State of California dated April 23, 1981.

In his second motion, the defendant moves that he be allowed to supplement the record with copies of the defendant's "Request for Disposition of Indictments in Illinois and California, and copies of Acceptance by those jurisdictions, obtained from Missouri State Penitentiary officials on December 7, 1983." The defendant maintains that under these agreements he should have been returned to Missouri after imposition of sentence in Illinois so that he could complete his term of imprisonment in Missouri and that failure to comply with his request violates his due process and equal protection rights.

We note, relevant to this issue, that Missouri, the sending State under the Agreement on Detainers, is not the only State in which defendant is under sentence. Defendant's record reveals the following outstanding sentences: (1) life imprisonment imposed in 1978 and a consecutive 35-year sentence imposed in 1979, both in Missouri; (2) concurrent terms of 20 years and 11 to 29 years imposed in 1979 and a consecutive term of 30 to 35 years also imposed in 1979, both in Tennessee; (3) 15 years to life, plus a consecutive determinate-enhancement term of 3 years in California, imposed in 1981, to be served consecutively to the sentences in Missouri.

The State objects to the defendant's motions because

it contends that, pursuant to our Rule 329 (87 Ill. 2d R. 329), the defendant's motions should be denied since he has failed to demonstrate that these documents were part of the proceedings at trial and these documents are "unrelated and extrinsic" to matters raised on appeal.

We cannot agree with the State that it is necessary for the defendant to demonstrate that these documents were part of the trial proceedings under our Rule 329. We also do not agree that these documents are unrelated or extrinsic. Rule 329 provides that "[i]f the record is insufficient to present fully and fairly the questions involved, the requisite portions may be supplied at the cost of the appellant." (87 Ill. 2d R. 329.) These documents are pertinent to an issue the defendant has raised both in the trial court and on appeal before this court. These documents will aid us in our disposition of this issue. Therefore, we allow both of defendant's motions to supplement the record.

We are not persuaded that the return of the defendant to Missouri is consonant with the purposes of the Agreement on Detainers. Article I of the Agreement provides:

> "The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." (Ill. Rev. Stat. 1973, ch. 38, par. 1003—8—9, art. I.)

Article V(e) provides that, "[a]t the earliest practicable time *consonant with the purposes of this agreement*, the prisoner shall be returned to the sending state." (Em-

phasis added.) Ill. Rev. Stat. 1973, ch. 38, par. 1003—8—9, art. V(e).

We have grave doubts, however, that these provisions were intended to apply where, as here, a sentence of death is imposed by the receiving State.

We direct the Attorney General, who represents the People in this case, after providing notice to the defendant, to communicate with the appropriate authorities in the States of Missouri and California to ascertain if those States wish to waive or enforce whatever rights they may have to the penal custody of the defendant.

In order that there may be a final judgment, for the reasons stated herein, the judgment of the circuit court of Cook County is affirmed in part and vacated in part. The clerk of this court is directed to enter an order setting Tuesday, May 19, 1987, as the date on which the sentence entered in the circuit court of Cook County is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

On the court's own motion, the date of execution is stayed until further order of this court to be issued after receipt by this court of the above-requested information.

*Motions allowed; judgment affirmed in part and vacated in part; order entered.*

CHIEF JUSTICE CLARK, concurring in part and dissenting in part:

I concur in the majority's affirmation of the judgment of the circuit court as to the defendant's convic-

tions. However, I dissent from that part of the majority opinion affirming the defendant's sentence of death because I do not believe that the murder statutes of Illinois and California are substantially similar for the purpose of imposing the death penalty under the multiple-murder, aggravating-factor provision of our Illinois murder statute.

Since the defendant in this case was convicted of second-degree murder, I believe the logical test of similarity is whether any defendant convicted of second-degree murder in California would also be found guilty of murder in Illinois under our statute. Since I believe that not all defendants convicted of second-degree murder in California would be found to have the requisite mental state to be found guilty of murder in Illinois, I respectfully dissent.

A defendant can be found guilty of second-degree murder in California without the prosecution having to prove that the killing was " 'deliberate and premeditated,' or that the defendant maturely and meaningfully reflected upon the gravity of his or her act." (Cal. Penal Code sec. 189 (West 1981).) In *People v. Gonzales* (1970), 4 Cal. App. 3d 593, 84 Cal. Rptr. 863, the California Court of Appeals quoted from the case of *People v. Butts* (1965), 236 Cal. App. 2d 817, 46 Cal. Rptr. 362, wherein it is stated:

> " 'Conviction of second degree murder requires no proof of premeditation or even of actual intent to take life; rather, the malice (intent) necessary to constitute second degree murder may be implied from commission of an unlawful act without sufficient provocation "or when the circumstances attending the killing show an abandoned and malignant heart." (Citations.)' (p. 827, 46 Cal. Rptr. 362.)" 4 Cal. App. 3d 593, 602, 84 Cal. Rptr. 863, 868.

The majority states that "the meaning given to ex-

press malice under the California murder statutes is virtually identical to the meaning given to intent as found in section 9—1(a)(1) of our murder statute." (115 Ill. 2d at 95.) I do not disagree with this statement. The majority also reasons that "[i]t is also clear that the meaning given to implied malice under California law closely tracks the meaning given to knowledge under Illinois law." (115 Ill. 2d at 96.) It is at this point that I begin to disagree with the majority's reasoning. Besides the obvious language difference in the two statutes, a person can be found guilty of second-degree murder in California under California's felony-murder provision in circumstances where the same person would not be found guilty of murder in Illinois under any of our applicable sections.

It is clear that some second-degree murder convictions in California are based on the defendant *knowing* that his conduct endangered the life of another. (See *People v. Watson* (1981), 30 Cal. 3d 290, 179 Cal. Rptr. 43, 637 P.2d 279.) This requirement is similar to our section 9—1(a)(2), which requires that a defendant "know[ ] that [his or her] acts create a strong probability of death or great bodily harm." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2).) However, California law recognizes another type of second-degree murder based on a second-degree felony-murder doctrine. In *People v. McIntire* (1931), 215 Cal. 50, 1 P.2d 443, no knowledge was required on the defendant's part because under California law the defendant was engaged in the commission of a felony—driving a car while intoxicated. Later, in *People v. Phillips* (1966), 64 Cal. 2d 574, 51 Cal. Rptr. 225, 414 P.2d 353, the court held that the doctrine only applies when the underlying felony is "inherently dangerous." However, knowledge still is not an element of second-degree felony murder, as is required under our section 9—1(a)(2). Moreover, our felony-murder provision, section

9—1(a)(3), requires that the underlying felony be a "forcible felony." A forcible felony is one which "involves the use or threat of physical force or violence against any individual." (Ill. Rev. Stat. 1985, ch. 38, par. 2—8.) It is clear that driving while intoxicated, as was the case in *McIntire*, would not be a forcible felony in Illinois.

The State argued that the defendant was not convicted under the second-degree felony-murder doctrine and therefore the differences between Illinois' and California's felony-murder provisions are irrelevant. However, it is the statutes that are to be compared for their similarity, not the actual act which led to the defendant's conviction.

If defendant McIntire came to Illinois after being convicted of second-degree murder in California and was convicted of murder under our murder statute, he would be eligible for the death penalty based on a crime in California which would be no more than reckless homicide in Illinois. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.) The factual scenario of a case like *McIntire* demonstrates the substantial difference between the Illinois and California murder statutes.

The majority also states that the difference between Illinois and California in regard to the imposition of the death penalty subsequent to conviction is not relevant to deciding whether our multiple-murder, aggravating-factor provision applies. (115 Ill. 2d at 100.) I believe that the fact that a second-degree murder conviction will not justify imposition of the death penalty in California (Cal. Penal Code sec. 190.1 (West Supp. 1986)) is relevant in a case where we are imposing death on the basis of that conviction.

For the above-stated reasons, I respectfully dissent.

GOLDENHERSH and SIMON, JJ., join in this partial concurrence and partial dissent.